UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMER HAMADEH and ALISON HARMELIN,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>CENLAR FSB,<br><br>　　　　Defendant. | Civil Action No.:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, **SAMER HAMADEH** and **ALISON HARMELIN** (collectively, hereinafter, "Plaintiffs") by and through their attorneys, **CONNELL FOLEY LLP**, respectfully submit this Complaint against defendant, **CENLAR FSB** (hereinafter, "Cenlar"), on the basis of the following allegations:

## PARTIES

1. At all times hereafter mentioned, Plaintiffs are residents of the State of New York, County of New York, residing at 190 East 72nd Street, 14AB, New York, NY 10021.

2. At all times hereafter, Cenlar was and is a mortgage loan subservicing company duly authorized to conduct business in the state of New York with its principal executive address listed as 425 Phillips Blvd., Ewing, NJ 08618.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over the instant action pursuant to 28 U.S.C. § 1331 because it involves questions of law arising under the Constitution, laws, or treaties of the United States.

4. Plaintiffs bring claims for violations of the Real Estate Settlement Procedures Act, 12 U.S.C. §2605, and the Fair Credit Reporting Act, 15 U.S.C. § 1681, both federal statutes.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the acts, omissions and transactions that give rise to this action occurred, in substantial part, in this district. Venue is also proper in this district because Plaintiffs live in this district, Defendant conducts business in this district and Plaintiffs' injuries occurred in this district.

## **GENERAL ALLEGATIONS**

6. Non-party Citibank issued Plaintiffs a home equity line of credit and primary mortgage loan (collectively, the "Loans") for their residential property located at 190 East 72nd Street, 14AB, New York, NY 10021 (the "Property").

7. Upon information and belief, at some point after Citibank issued the Loans to the Plaintiffs, Cenlar was hired by Citibank to service such loans. As such, Cenlar has been collecting payments, managing escrow accounts, and ensuring timely payment of property taxes and insurance for the Loans.

8. In mid-2023, Plaintiffs requested Loan modifications from Cenlar.

9. Plaintiffs engaged in extensive correspondence with Cenlar concerning such loan modification, after which the Plaintiffs were eventually informed that the primary mortgage loan had been approved for a loan modification and the home equity line of credit was pending modification.

10. During this time, while Plaintiffs were seeking loan modifications, they engaged in meaningful discussions with Cenlar regarding future mortgage payments.

11. On January 2, 2024, Plaintiffs received written notice from Cenlar that they were behind on their mortgage payment.

12. In connection with the January 2, 2024 letter, Cenlar also alerted Plaintiffs' alleged deficiencies on the Loans to outside parties – including credit rating agencies.

13. Cenlar failed to timely discuss these deficiencies with Plaintiffs before alerting outside parties of their alleged Loan deficiencies.

14. Under the protection of 12 U.S.C. § 2605, Plaintiffs were entitled to certain disclosures, settlement services, and protection from negative credit reporting.

15. However, in January 2024, Plaintiffs' credit scores decreased significantly as a result of Cenlar's reporting.

16. Plaintiff Samer Hamadeh's credit score dropped from 680 FICO to 609 FICO.

17. Plaintiff Alison Harmelin's credit score dropped from 715 FICO to 568 FICO.

18. Plaintiffs had multiple credit card limits cut by thousands, and in some cases, tens of thousands of dollars.

19. Plaintiffs had not been delinquent on any of their credit accounts during this time.

20. As a result of Plaintiffs' decreased lines of credit and impacted FICO score, Plaintiffs have been unable to pursue purchases that required the use of credit.

21. Throughout this time, Cenlar continued to make assurances to Plaintiffs that they were aware of the nature and pending status of the loan modifications, subject to the protections of 12 U.S.C. § 2605.

22. Despite Plaintiffs' multiple attempts to discuss the loan modifications and Cenlar's assurances that the modifications remained pending, Plaintiffs have suffered damages due to Cenlar's actions and inactions, spending time and money attempting to engage with Cenlar through counsel as well as remedy and recover from their negative credit reporting.

23. Additionally, Plaintiffs have suffered significant emotional distress as a result of the ongoing stress, anxiety and mental anguish due to Cenlar's actions.

## COUNT ONE
## VIOLATION OF THE REAL ESTATE SETTLEMENT
## PROCEDURES ACT, 12 U.S.C.A. § 2605(e)(3)

24. Plaintiffs repeat and reiterate each and every allegation above as if set forth fully in this count.

25. Plaintiffs are "borrowers," entitled to the protections codified within 12 U.S.C.A. § 2605.

26. Cenlar is a mortgage service provider subject to the mandatory requirements of 12 U.S.C.A. § 2605.

27. Pursuant to 12 U.S.C.A. § 2605(e)(3), Cenlar has a legal duty to protect their "borrower's" credit ratings when a borrower submits a "qualified written request" regarding a dispute about their mortgage payments.

28. Pursuant to 12 U.S.C.A. § 2605(e)(1)(B), a "qualified written request" includes any written correspondence which identifies the name and account of the borrower and includes a statement of the reasons for the belief of the borrower, that the account is in error.

29. Pursuant to 12 U.S.C.A. § 2605(e)(3), Cenlar cannot provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency during a 60-day period following the receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments.

30. Pursuant to 12 U.S.C.A. § 2605(e)(1)(B), Plaintiffs submitted a "qualified written request" to Cenlar regarding information regarding their primary mortgage loan and home equity line of credit.

31. Pursuant to 12 U.S.C.A. § 2605(e)(1)(B), Cenlar could not report any overdue payments relating to Plaintiffs' primary mortgage loan and home equity line of credit to a credit

agency for 60 days following receipt of the qualified written request, protecting a borrower's credit rating while their dispute is being investigated.

32. Cenlar recklessly, willfully, intentionally and/or negligently failed to comply with the requirements of 12 U.S.C.A. § 2605(e)(3) by improperly reporting Plaintiffs as overdue on their payments on the primary mortgage loan and home equity line of credit.

33. As a direct result of Cenlar's reckless, willful, intentional and/or negligent misreporting in Plaintiffs' credit file, Plaintiff Samer Hamadeh's credit was damaged by causing a reduction in his credit score from 680 FICO to 609 FICO.

34. As a direct result of Cenlar's reckless, willful, intentional and/or negligent misreporting in Plaintiffs credit file, Plaintiff Samer Hamadeh's credit was damaged by causing a reduction in his credit limit on multiple credit cards as well as the closing of several credit cards.

35. As a direct result of Cenlar's reckless, willful, intentional and/or negligent misreporting in Plaintiffs' credit file, Plaintiff Alison Harmelin's credit was damaged by causing a reduction in her credit score from 715 FICO to 568 FICO.

36. The inaccurate credit reporting by Cenlar is the direct and proximate cause of the reduction in the Plaintiffs' credit scores.

37. Cenlar's negative credit reporting of the Plaintiffs' pending loan modifications has caused their joint and individual credit scores to decrease and their individual credit limits have been cut substantially, impacting their ability to pursue purchases that required use of credit.

38. Plaintiffs have suffered significant emotional distress as a result of the ongoing stress, anxiety and mental anguish incurred in connection with Cenlar's actions.

39. As a direct and proximate result of Cenlar's actions, Plaintiffs have suffered and continue to suffer damages.

## COUNT TWO
## FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681

40. Plaintiffs repeat and reiterate each and every allegation above as if set forth fully in this count.

41. Plaintiffs are "consumers" as defined by 15 U.S.C. § 1681a(c).

42. At all times pertinent hereto, Cenlar supplied information related to consumers to consumer credit reporting agencies, as defined by 15 U.S.C. §1681.

43. Under the Fair Credit Reporting Act ("FCRA"), persons who furnish credit information about consumers may not report any inaccurate information.

44. Furthermore, furnishers of consumer credit information have a duty to investigate claims of inaccuracy and have a duty to correct and update information that they have reported, if it is inaccurate or if it becomes inaccurate.

45. On multiple occasions, Plaintiffs contacted Cenlar and disputed the accuracy of the information that Cenlar reported to the credit reporting agencies.

46. Cenlar was aware of the dispute and acknowledged that the information that it had reported was inaccurate.

47. Pursuant to the FCRA, Cenlar was obligated to correct the inaccurate information concerning the Plaintiffs.

48. Cenlar knowingly reported inaccurate information about Plaintiffs to the credit reporting agencies and failed to correct the inaccuracies, despite that Plaintiffs informing Cenlar that the information that it reported was inaccurate.

49. Plaintiffs continued to communicate with Cenlar confirming that their primary mortgage loan and home equity line of credit modifications remained pending.

50. Cenlar willfully and/or negligently failed to comply with the requirements of the FCRA and is liable to pay damages and costs of litigation to Plaintiff under 15 U.S.C. § 1681.

51. As a direct result of Defendants' negligent, reckless, and/or intentional misreporting Plaintiffs' credit was damaged by causing a reduction in Plaintiffs' credit scores.

52. As a direct result of Cenlar's actions and omissions, Plaintiffs were denied several applications for credit.

53. As a direct and proximate result of Cenlar's actions, Plaintiffs have suffered and continue to suffer damages.

## COUNT THREE
## DECEPTIVE ACTS AND PRACTICES
## (NEW YORK STATE GENERAL BUSINESS LAW § 349)

54. Plaintiffs repeat and reiterate each and every allegation above as if set forth fully in this count.

55. Section 349 of the New York State General Business Law ("GBL") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."

56. Under GBL § 349(h), an individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful acts or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions."

57. At all relevant times, Cenlar conducted business or furnished services as those terms are used in GBL § 349.

58. Upon information and belief, Cenlar services millions of mortgage loans, and its deceptive acts and practices were consumer oriented.

59. Cenlar engaged in deceptive acts or practices by falsely giving Plaintiffs the impression that the Loans were not in default by accepting Plaintiffs' monthly payments.

60. Cenlar engaged in deceptive acts or practices by falsely giving Plaintiffs the impression that the Loans were being evaluated for pending modifications.

61. Cenlar engaged in deceptive acts or practices by falsely giving Plaintiffs the impression that the Loans were not in default, while simultaneously alerting Plaintiffs' alleged deficiencies on the Loans to outside parties – including credit rating agencies.

62. In fact, Cenlar's Deputy General Counsel assured Plaintiff that Cenlar would not report any activity to any credit reporting agencies. After Cenlar's Deputy General Counsel was made aware of the negative reporting, he acknowledged the error, apologized and informed the Plaintiffs that it would not happen again. Yet, it did happen again.

63. Cenlar's deceptive acts and practices were further materially misleading by Cenlar's failure to accurately represent the status of the Loans modifications to credit reporting agencies, despite being required to under the law.

64. Cenlar's deceptive acts and practices have caused Plaintiffs' joint and individual credit scores to decrease.

65. Cenlar's deceptive acts and practices have caused Plaintiffs' individual credit limits to decrease, impacting their ability to pursue purchases that required use of credit.

66. As a direct and proximate result of Cenlar's actions, Plaintiffs have suffered and continue to suffer damages.

As a direct and proximate result of Defendants' violations of GBL § 349, Plaintiffs are entitled to compensatory damages, equitable and declaratory relief, injunctive relief, punitive damages, costs and reasonable attorneys' fees.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully demand that this Court enter judgement in their favor and against Cenlar, and:

A. Award a total sum of actual damages, attorneys fees, and costs to Plaintiffs in the amount this Court deems appropriate;

B. Award statutory damages to Plaintiffs pursuant to RESPA, 12 U.S.C.A. § 2605(f);

C. Award statutory damages to Plaintiffs pursuant to FCRA, 15 U.S.C. § 1681n;

D. Award statutory damages to Plaintiffs pursuant to GBL § 349(h); and

E. Provide such other or further relief as this Court deems appropriate.

Dated: New York, New York
June 30, 2025

CONNELL FOLEY LLP

By: _____
Eric Weissman
875 Third Avenue, 21st Floor
New York, New York 10022
Telephone: 212.307.3700
Facsimile: 212.542.3790

Attorneys for Plaintiffs
*Samer Hamadeh and Alison Harmelin*

16721832-7